The jurisdiction of this court is nationwide. The statute contemplates that we sit from time to time in other parts of the country, and we've managed to sit in all of the other circuits over the years, in most cases more than once. The court was in Richmond and Charlottesville a few months ago. It sat at the law schools and at the Fourth Circuit Courthouse. But because of a scheduling conflict, we were not able to meet the session here. And so we have come back to complete the schedule. We are privileged to be here. We appreciate the cordial reception, and we appreciate counsel coming a little bit out of the way to have their cases heard here, although Charlottesville is a nice place to visit. The first case this morning will be Lovering-Johnson, Inc. Court rated, be the Secretary of the Navy, 06-1268. Mr. Lear-Thompson. May it please the Court. I'm Dean Thompson, and I represent the appellant Lovering-Johnson, who I'll refer to as LJI. The fundamental error that pervades the entire Board's decision is really contained in about a page and a half of its decision, starting at A32 of the appendix. And I'd like to review those few pages during most of the time of my argument this morning. The Board starts out on page A32 under Claim Item 1 and 8, saying, The gravamen of much of the dispute in this appeal flows from appellant's general complaint that it was required to perform unfunded preliminary design studies that exceeded its contractual design responsibilities. This is not the gravamen or fundamental essence of LJI's claim in this case. LJI concedes and has always conceded it has final design responsibility as the design builder. This is not a case based on LJI's complaining it had to produce a final design. Therefore, all the factual findings and legal observations on this truism are really off point. Instead, in this case— If that's not the gravamen of your dispute, what is the gravamen? Exactly this. But this case is about whether LJI, as a design builder, could rely at the time of the proposal on the design indications inserted in the RFP by the Navy. Now, at least three cases hold that LJI— Is that your differing site condition? Yes, it is, Your Honor. Yes. Why don't you address that directly then? Where's the error? I thought the board found that you had not sustained your case on showing there was a sufficient different site condition to warrant delay for you. Well, the board— I'll be quite honest with you. As I read the decision below and read the two briefs, I didn't see that there was any legal issue of any significance that was in front of us. It was entirely a matter of finding the fact. Your Honor, the— Am I correct in that respect? I don't believe so. What's the legal issue? There are three of them that are contained on pages A32 through A34, and the board supports its finding that there isn't a differing site conditions clause. What is the legal issue? The first one is this, is whether LLJ is entitled to, as a design builder, to rely on legal indications in the design documents. And the court finds that as a matter of law, it's not. Here's what the court says. First, no reasonable contractor would assume that the Navy had developed a stormwater drainage design relieving LJI of the design responsibilities noted above. Well, what was the fact situation? Weren't there a couple of preexisting ditches in which water could run off? Well, there was a minor swale, and then what the plans indicated was that a civil design was intended here with pipes of 15 inches to 36 inches. Is your argument that your client had no further design responsibility other than just to duplicate or employ whatever existing conditions were there for water control? At the time of the proposal— Does your client have any independent additional design responsibilities? Can you answer that yes or no? Yes, it does. At the time it develops the final design, after it's awarded the contract, until its design is completed, it must confirm, it must verify what those design indications were on the documents that were provided by the Navy. But the point is, is LJI, as a proposer, entitled to rely, when it's submitting its proposal, on indications of design provided by the Navy? What were these indications of design on which you want to rely? They are a system of pipes that was to take the stormwater drainage on the site and shunt them away from the site. That is the purpose of that design. So if we assume that LJI is entitled to rely on indications, which I think we are, according to three cases we've cited—Mortenson, Donahue Electric, and Pitt-Des Moines— they all say that we are entitled to that type of reliance. This case says we aren't. That's why this case is troubled. Ford says you're not entitled to rely. Exactly. It says it on the second full paragraph in A33. It's a legal analysis as to why we're not entitled to rely. Why? Because we're the design builder with the ultimate design responsibility. Therefore, relying on any design indications is unreasonable. Again, that's an error. According to the three cases we've cited, of course we're entitled to rely on them. How else would we come up with a proposal unless the Navy told us the type of design they were interested in? At the time of the proposal stage— Where did this error result in harm to your client? This is a delay case, isn't it? Essentially, yes. So how do you print out from this error that you contend that was made to your delay? Where is the connection? Well, there's at least six months of delay tied to this error in the indications because we intended to start the civil work in March of 1996 because of this design error. 60 days went by before you even hired an engineer, right? That is true, but if this indication were correct, had it been correct, we still would have been on schedule, able to start on March of 1996. What does that mean? There would have been no further— You could have simply relied on what design was there and asked for a notice to proceed? No, Your Honor, we would have had to verify the design, and when we tried to verify the design, that's when we found out it was an error. That's when it became a change. And under the changes clause, we're entitled to a time extension because the indication was inaccurate. That delayed us by at least six months because we started in August with our civil work, and we were supposed to start in March. It's a six-month delay due to exactly this error. So that's a legal error. Well, there was no delay once the program started, right? That is what the record reflects, yes. But there was a substantial delay in trying to resolve this civil design, which the Navy told us would take 36 inches. I thought that they said that there were a number of instances in which there was delay during this time period that was chargeable to your client. No, you're correct. The Board finds a number of concurrent delays. However— Now, are you challenging that? You don't get credit for a concurrent delay. I may not get credit in terms of compensation, but at least it suspends actual or liquidated damages, and there's substantial imposition. There are no liquidated damages charged that you complain about. There are. There's at least about $450,000 of L.D.s that were charged to my client. There's no delay. Yes, and I'm saying the delay is excusable, and it's a concurrent delay, but since it's excusable because it's concurrent, we don't have to pay those L.D.s. And I'm also saying that the record does provide an adequate basis to find quantum. We were the only ones— excuse me, LJI was the only one who provided expert testimony on how you could trace out and allocate this delay. There is no contrary expert scheduling testimony. The Board ignored that. And the Board itself found a way to allocate delays when it awarded us 20 days on the exclusion area. So the Board, using essentially the jury verdict method, could find a way to allocate quantum for the exclusion delay. It certainly could find a way on remand to allocate delay here. I've covered one reason the Board found that there was no implied warranty here, and that's a legal reason. Let me cover the second one. It said there's no careful and considered analysis of what the drawings purported to indicate. We need probative engineering guidance to find out what these 15- to 36-inch pipes mean. Well, what is the reason for the delay? Because the government had given you incomplete designs? No, they— For a drainage system? Excuse me, Arnard. No, it's because they'd given us inadequate, inaccurate indications. What the government said is you've got a minor flow problem here that can be handled with 15- to 36-inch pipes. Instead— Well, the government never said that. You inferred that from what the drawings indicated to you, isn't that right? Well, actually, the government engineer who was hired to prepare the 35 percent designs that were included in the RFP, he said these were prepared to indicate to bidders what to expect and was to form the basis of their bid. Did your client look at the HARSA report or at any of the studies that had been made of the floodplain problem here? Not prior to bid. Why not? Well, that goes to our withheld superior knowledge claim that we have here. And there's a good reason we didn't look at the report. This was a design indicated to us. The purpose of a design is so that we can rely on it. The purpose of that design is not so we can redo it at the proposal stage. This wasn't a design of a rocket ship, which— and you were told, build to this design. You were told, your client was told specifically to be the designer. Once it is awarded the project, that's correct. Up to the time it's awarded the project, it's told you can rely on the design indications we have here, you're to verify them later. Your Honor, the engineer that the Navy hired to prepare between 35 and 50 percent complete documents, he didn't ask for the HARSA report. And he was charged with developing that design upon which people were to rely. Now, it's a double standard to say that the Navy's own designer ship doesn't have to look at the HARSA report, but the proposer who's supposed to be able to rely on the Navy's engineer's work, well, he's supposed to ask for the HARSA report. Why? Because he's supposed to, what, redo the Navy's design so he can bid? Doesn't this problem of yours come down to a question of whether you were entitled to reasonably rely on what the government has shown you in terms of determining whether your bid could safely assume something about the stormwater drainage? Doesn't it come down to the question of whether you were reasonably entitled to rely? Well, yes. And that's a legal issue as to whether these are intended indications. And they are intended indications. The only issue that I find interesting in this case is the 60-inch conduits. And the government says, well, we're not reasonably relying on the 36-inch pipes because you've got 60-inch conduits out there. Remind me about what the standard of review is, counsel, for us. You've been through the agency. You've been through the contract board and appeals. And now you're before us. What is our standard of review and what are we reviewing? Well, your standard of review on legal issues is de novo. I think the three issues that support the board's differing site conditions claim are all legal. You want to convert everything to a legal issue so we can rehear the case. If I could, I would, yes. But I think fairly they are legal issues. It's a question of whether you can reasonably rely, a question of fact. Well, not according to the board's decision because they say as a matter of law, you don't have the right to rely on these indications. Therefore, your reliance is unreasonable. Under that phrasing, that's a legal question. Why is that so? The board says no reasonable contractor would assume the Navy had developed a system relieving you of the design responsibility. Because they say as a matter of law, there's a legal obligation to be the designer. Therefore, as a matter of law, you can't rely. That's a legal conclusion. What's wrong with that law? Well, three cases. As a design bill contract, you are the designer, right? Three existing cases say that's wrong. The Pitt-Des Moines, the Mortenson case, and the Donahue-Electric case all say that the Spearing Doctrine still applies to a design builder to the extent the government indicates a design. And here, the government clearly indicated a design. And that's omitted by the government's own designer. What would happen to your case if we were to decide the board was correct in saying there was no typo in different site condition here? Well, then much of Loveland-Johnson's case goes away. Right. Yes. And isn't typically, in the review of these cases, the question of whether there is or is not a typo in different site condition a fact issue? Well, the typical... In the ordinary case. In the ordinary case, yes. But the court here, in its analysis, based it on legal premises. And it based a couple of things. We need engineering guidance. That's one reason they say. But they had the government's own engineer saying, I intend this. Do we review the opinion of the board, or do we review the judgment of the board? That is, are we reviewing what the board ultimately held, concluded? Or are we going, is it our job to try to parse the language of the board's opinion and determine whether they said it correctly? Well, I believe the latter, that you have to look at the board's analysis and find out if it's a conclusion of law and whether it's the right conclusion of law. And if we conclude it was a conclusion of fact, where are you? Well, then you have to judge it by the substantial evidence standard. And that's why I say when the board says, we need engineering guidance, well, that decision isn't supported by substantial evidence because in the record is the Navy's own engineer admitting what this was intended to do. They don't need engineering guidance. They have it. They're deliberately ignoring it. That's an egregious error. And when the board holds Leveran-Johnson to a standard of recognizing the import of a 60-inch culvert, they're relieving the government of that obligation, yet they're arbitrarily and capriciously holding Leveran-Johnson to that higher standard. Mr. Johnson, we'll let you use your rebuttal time. We'll give you a few minutes in rebuttal. Let's hear from the government. I appreciate that. Thank you. Ms. Conrad? Good morning. Ms. Conrad, some people might think you're already starting out with two strikes against you in this case. How's that, Your Honor? Well, if I look around the room, I see almost entirely Army uniforms. I think we're in an Army facility, and you're here representing the Navy. That's true, Your Honor. Hopefully they'll forgive me this one time. Well, we'll try. May it please the Court, Leveran-Johnson has failed to demonstrate error in the board's decision. The board's legal conclusions are supported by its extensive findings of fact in this case. Let me ask you something before we get into the argument. Do you see any impediment to reviewing this case here when the quantum has not been decided on the liquidated damages claim? Yes. On the liquidated damages claim, the quantum has not been decided on that issue, and there has not been a final decision on that claim. It was remanded for a determination of quantum for several reasons, not only the 20 days of time extension that the board found, but the board also found that there were mistakes and discrepancies in the Navy's calculation of damages. So this Court should follow its decision in Dewey Electronics and not permit Leveran-Johnson to appeal. Wait a second. I mean, the fact that quantum hasn't decided doesn't destroy finality for purposes of review, does it? No. I mean, all the time cases come up, they're entitlement only, right? Right. And they flow through to us with no objection. Well, here, though, entitlement was not denied. There's not a final decision because it was remanded for a determination of quantum. Oh, wait a minute. Denied by whom? The board. Ah, but we don't review, or let me put it this way. The jurisdictional test is not what the board did, is it? I understood from Dewey and Contell Advanced that the jurisdictional test was key to what it was that the contracting officer decided because that's the only thing that was on appeal to the board. What did the contracting officer in this case do? Well, I don't believe the contracting officer has made a final decision on liquidated damages. He didn't make a final decision on anything, did he? Before it came to the board or after? Before it came to the board. Before he did, yes. He denied it all. He denied it all. He denied it all? Mm-hmm. So he acted only on entitlement? Yes. Is that right? Yes. He didn't make any decisions on quantum? That's correct. In which case, what then was before the board? The board was just determining entitlement. But the board did not deny. There was not a final decision. I mean, the board did not deny entitlement. It went back to the contracting officer for a determination of quantum. But does that keep us from having one? In this case, abstainment is a certain degree of entitlement. That's correct. It said you're entitled to a certain amount of work, but you need to go back and run the numbers up. Right. And what I'm saying is how does that differ from any other case in which quantum was never decided by anybody, only entitlement? The case comes up to the board, just entitlement. The board says, oh, you're entitled. So the entitlement issue comes up to us, and they don't bother to go back to the contracting officer for quantum until it's decided by us whether the entitlement decision was correct. Right? That happens all the time. So how is this case different? What's the jurisdictional fuss? There hasn't been a final decision on quantum. I mean, it hasn't been finally decided. Well, you can't determine if the liquidated damages. Quantum is how much money you get if you're entitled, right? Right. And they bifurcate entitlement and quantum all the time. Right? That's correct. And so in one aspect of this case, there's been a bifurcation of quantum and entitlement on liquidated damages. That's correct. So what? Well, one of the things — If finality is destroyed here on this claim, then why isn't finality destroyed always when quantum hasn't been decided, when quantum is to be decided on remand after entitlement? Yes, ma'am. Well, I think part of the problem here is that one of the things that Laverne Johnson is arguing is that the punitive damages were — I'm sorry, the liquidated damages were punitive and unenforceable. That's got nothing to do with jurisdiction. The quality of the argument that they mount in challenging entitlement can't have anything to do with whether jurisdiction is destroyed because there's been a remand for quantum. How — if you won on this issue in this case, liquidated damage, and we said, oh, well, you're right because there was a remand for quantum even though entitlement's been found, no jurisdiction, then the next time up that you have a case where there's just been a clean bifurcation, right, then you're going to have to argue no jurisdiction, right? I mean, is the government using this as a test case to try to develop a new rule that — No, we're not. — gives 50 years of contract adjudication? No, Your Honor, we're not. No. And what's the purpose? Let me read to you from England v. Contel Advance, the 2004 decision of this court. As we noted in applied companies where the contracting officer decided only entitlement and the board thereafter decided entitlement and remanded to the parties regarding quantum, the board's decision was final and thus appealable. In this case, referring to the Contel case, in this case we have jurisdiction under Section 11295A.10 because the scope of the CO's decision was limited to the question of entitlement. Why doesn't that decide the jurisdictional issue here? Your Honor, I'm familiar with that case. I had not read it before, this argument. But it is our position that there still hasn't been a final decision. I mean, it could still come back through the board. Well, I know that's your position, but I think your position is inconsistent with our law, so maybe that's not a very good argument. Now, you mentioned a minute ago that some decisions have been made after the board ruled that this was remanded. It was remanded. Has it? No, there has not been a final decision. Nothing's happened. That's correct. That's correct, Your Honor. But moving on to the multiple factual findings of the board, there were multiple factual findings of contractor-caused delay which relate to their appeal of the Type I differing site condition. Mr. Kvister, Thompson put all of his eggs in the page 32, 33, 34 basket, if you will. And he argued that there is a fundamental legal error with regard to claim items 1 and 8. You heard his argument. Yes. I think he appreciates that if this is simply a question of fact, then he's a captive of the standard of review, right? That's correct. Why don't you respond so that he then has a chance in his rebuttal to come back fair and square with his issue? Respond to his argument that this is a legal issue and there was legal error by the board. I respectfully disagree. I think it was a factual finding that there was not a differing site condition because what the court looked at was not only indications. Well, his argument was that the board was wrong as a matter of law to say that no reasonable contractor could rely on the Navy's design. Isn't that in a nutshell what he said? Yes, that was his argument. Now, why is he wrong? Because this was a design-build contract. And I think Levering and Johnson, in this case, as the board properly found, misconstrued their responsibilities under a design-build contract. What happens under a design-build contract if the Navy comes forward and says, well, Clevenger Industries, this is a design-build contract, but here's the design, you know, our preliminary design we've worked up, right? It'll give you a head, get you a little head start. Is Clevenger Industries entitled to rely on what the Navy gave me as a preliminary design? That's, yes. But here's where it's different. What he's talking about, the water drainage, there wasn't a preliminary design for that. What it showed was the preexisting, what was already on that site, the 36-inch pipe and the two 60-inch culverts. That's what was already there. It was the specifications, and I believe they're saying- Presumably, that system had been moving water when water came and exited. That's correct, but that's before there was 140 housing units on that site, or that was before this development occurred. So the board cited the specific specifications in their opinion, but basically it was the contractor's responsibility to determine the flow and the design and the water drainage system that could handle it. That was part of their responsibility in a design-build contract. They had to design the system. So is that when the board was saying no reasonable contractor would have assumed that this existing design was going to work because they don't have 140 houses on it? Exactly, exactly. And also, the board noted multiple times that a pre-proposal site visit, or even looking at the two 60-inch culverts, 60-inch culverts- Let me understand what happened to delay. I gather that the contractor was thinking, well, the existing drainage system is going to work. It's sufficient. And there was a system in the contract where 60 days in or whatever, there had to be a meeting where the contracting officer or somebody from the Navy was going to talk to them about the design, right? At that stage in the game, the Navy began rejecting, saying no, no, no, you haven't convinced us that you're going to control the water. Right. That one led to the delay? No, I believe that what they claim led to the delay is the- Was it September? Right. The contract was ordered in September, and then in October 1995, there was a meeting in which the Navy said the potential borrow pit where the pond could be for site A had to be moved because it was a landfill. So they moved that location. And that's where the 20 days of delay that the board- Right. Found. And then the contractor, I mean, Levering Johnson is arguing that that and when they're, whenever they hired their civil engineering firm, I believe it was like 60 days after contract award, when the civil engineering firm eventually went out and looked at the site and everything, they determined that the existing, what was in the RFP depicting the existing system was not sufficient. So there were multiple, I don't know which stage the contractors submitted the water drainage system design, but there were multiple conferences. There was a 40% review and an 80% review. And as the board found, the contractor's documents were very piecemeal. It took a lot more time to review these documents than was originally anticipated. And there was a lot of back and forth between the parties when they, until they finally got to the final design, which I believe wasn't approved until like 1997. How did they finally accomplish the design? Did they put in larger culverts? They just put in a 72-inch pipe. Actually, their, I believe, whoever their civil design engineering firm gave them two options. One was to put in a 72-inch pipe, and one, I believe, was to put in a slightly smaller pipe. This is in the findings of the fact of the board. And an overground system, and Lovering-Johnson chose the just 72-inch pipe because it was cheaper. Why didn't the Navy simply, this was a contractor who, according to the board, was having its maiden voyage with design built. That's correct. Why didn't the Navy simply call them in the first time they showed up with their engineers and say, you know, we're going to put 140 housing units in here. In the past, when it was a vacant field or whatever, we ran the excess water off of the stuff that's here. Get in here right away and figure out what size pipes you're going to need. There's a bit of a cat and mouse going on here with the Navy contracting officer sitting back and just sort of saying, oh, that's not good enough. No, no, no, no. It was the responsibility of the contractor, of course, to design the system. And there was lots of back and forth in trying to get the design approved. And actually, that's one of their complaints now is that the Navy took too long. I can't understand from a practical point of view why it took so darn long. Well, actually, the board found, well, I think it's, that's the other problem. We don't know how much time it took because there never was a contemporaneous schedule submitted. And there was, actually, Lovering-Johnson breached its contractual duty to provide a completed network analysis system within 60 days. Actually, they didn't provide the final one until September 1997. The delay got them into winter, and then they had delay because of the winter. So the Navy never knew which activities were on the critical path. The Navy never knew how this site, the change to site A, the design delays, how that affected the activities on the critical path. That was part of the reason they were kept asking for substantiation for their request for time extensions. But it wasn't the fact that the Navy was withholding information. I wasn't trying to argue a bad faith, and I wasn't also trying to argue superior knowledge. What I was curious to know is whether or not, and I'll ask you directly, I mean, when the Navy's engaging with a design-build contractor and it's the first time around, now, I don't know, did the Navy know that this was the first time around for Lovering-Johnson? Yes, yes. Does the Navy have any established policy for how it greets a novice? I don't know the answer to that, Your Honor. I don't know. It wouldn't be a bad policy, would it? No, it would not. But there's a lot of evidence that the Navy did spend a lot of time, a lot of time with Lovering-Johnson trying to get the different designs to meet the RFP requirements and the contract specification. There's a lot of back and forth. It took almost eight months to review all the design documentation. One of the things that might have put LJI under the gun was this liquidated damages clause problem. Do you have any idea where they came up with $220 per unit per day rule at the outset, which they subsequently modified to $26 or something? That would be a rather frightening liquidated damages clause for the contractor. It would, wouldn't it? Yes, Your Honor. I don't know where that amount originally came from, but it was never enforced. I think maybe it was enforced for a couple months, but then all that was returned. Does it have to be enforced in order to have any consequences? The contractor here is arguing that the interim effect of this egregious, huge amount of liquidated damages scared it to death and forced it to go out and hire more people to work faster once they realized they were behind the eight ball and a delay with mounting every day, right? That's correct, Your Honor. However, the board found no persuasive evidence of acceleration before March 1997, and that's when the parties agreed not to enforce that liquidated damages clause. And a persuasive evidence, that's a credibility determination that this court reviews. Let's assume, I think from my perspective, I agree with you. I saw that board finding to say, well, your interim argument won't work in this case. If that fact finding hadn't been made, would you agree that there can be some adverse consequences to the Navy if it has in the contract a hideously huge liquidated damages clause that is enough to scare anybody to death so that once delayed begins to mount, they've got to run out and hire a whole mess of troops, a whole mess of people to come in and accelerate the contract? Yes. If they had accelerated, if there was evidence of acceleration before the Navy waived that clause? Well, I still think they wouldn't meet the other requirements for a constructive acceleration claim because, of course, that the government gave you constructive notice to accelerate is only one of the elements, as this court held in Frazier construction. But, yes, that would, you know, perhaps cause them to act quickly. Thank you. Thank you. Mr. Thompson? Let me cover two points. Liquidated damages, it is pointless to refer for a quantum determination a clause that is void, legally void, and that's what Lover and Johnson contends a liquidated damage clause is. Counsel for the government says it was never enforced. That's not accurate. The money wasn't retained, but the clause was always imposed. The government just said, we'll take it out of your paycheck at the end of the project, and not a couple of weeks before the end of the project, that's when they abandoned it. Would your argument rather move at this point because you're not arguing that the $26 clause is void as punitive argument? Actually, we're saying that the clause by itself is void, that you cannot renegotiate an illegal clause and have the consideration for that illegal clause form the, excuse me, can't have the illegality form the consideration for that modification. You're saying the parties jointly could not rewrite the contract? Not when the consideration is the illegality of the first clause. It's kind of rewording the extortion, in a sense, by analogy. There's no extortion because there was no acceleration. If you had accelerated, if there had been evidence in the record that your client actually engaged in its acceleration under the interim effect of what you contend to be an illegal clause, the government has conceded it. That if you could show that there was an excusable delay, you'd be in clover. Well, Your Honor, I would say to the extent that that is a factual finding- Is this, at this point, your weakest arguments? Your Honor, I think that the no-acceleration finding is arbitrary and capricious, and I'll just take this brief moment to say why. We were delayed six months at the start, yet we finished the last unit on time, the last unit on time. You cannot have- you have to have an acceleration if you start six months late, but you complete your last unit on time. A finding to the contrary has to be arbitrary and capricious. Now, let me return to the differing site conditions argument. They say the finding is not a legal one, but if you look on- What they say is that what they gave you was a snapshot of what existed. That's wrong. That's wrong. Yes, this is not- the design indications here were not what existed. If you look in the appendix, you'll see the half-sized drawings, and I forgot to bring it up with me. Oh, that's all right, because you've only got about 25 seconds here. It's page 1847. Those are designs for a 15- to 36-inch system, new designs. They aren't what exists. They're intertwined with the units. So that is a new design, and it didn't take into account- the problem is it didn't take into account the 300 acres above the site. The site itself, the 140 units, was not important. All right, sir. Thank you very much. Thank you. The case is submitted.